# EXHIBIT C

**INTERNATIONAL CHAMBER OF COMMERCE**          **ICC CASE NO. _____**

**IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF ARBITRATION
OF THE INTERNATIONAL CHAMBER OF COMMERCE**

**BETWEEN**

**EXELON GENERATION COMPANY, LLC**

**(U.S.A.)**

**Claimant**

**and**

**EDF INC.**

**(U.S.A.)**

**Respondent**

———————————————————————————

**CLAIMANT'S REQUEST FOR ARBITRATION**
———————————————————————————

**July 8, 2020**

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
United States

# TABLE OF CONTENTS

EXECUTIVE SUMMARY ............................................................................................................ 1

I.    BACKGROUND TO THE DISPUTE ............................................................................... 4

      I.A.   The Parties ................................................................................................... 4

      I.B.   CENG ........................................................................................................... 5

      I.C.   EDF's Exercise Of Its Put Option And The Put Agreement's Procedure For
             Determining Fair Market Value ................................................................. 6

      I.D.   The Parties' Negotiations To Date ............................................................. 9

      I.E.   EDF's Unsuccessful Attempt To Use The Pre-Arbitral Referee Procedure
             To Resolve The Dispute Between The Parties ........................................ 11

      I.F.   The Status Of The Baseball Arbitration ................................................. 13

II.   THE DISPUTE BEFORE THE ARBITRAL TRIBUNAL ................................................ 15

III.  EXELON REQUESTS AN IMMEDIATE STAY OF THE BASEBALL ARBITRATION ...................... 17

IV.   PROCEDURAL MATTERS ......................................................................................... 18

      IV.A.  The Arbitration Agreement ..................................................................... 18

      IV.B.  The Arbitral Tribunal ............................................................................... 20

      IV.C.  Requisite Copies And Filing Fee ............................................................ 21

V.    REQUEST FOR RELIEF ............................................................................................. 21

1.     In accordance with Article 4 of the Rules of Arbitration of the International Chamber of Commerce (the "**Rules**"), Exelon Generation Company, LLC ("**Exelon**") hereby submits its Request for Arbitration (the "**Request for Arbitration**"), together with **Annex A**, and **Exhibits C-001 to C-029**.

## EXECUTIVE SUMMARY

2.     This dispute concerns the interpretation of a Put Agreement that grants EDF Inc. ("**EDF**") the right to require Exelon to purchase its interest in the joint venture between the Parties.[1] The Parties jointly own Constellation Energy Nuclear Group, LLC ("**CENG**"), a company that owns and operates three nuclear power plants in Maryland and New York.  Exelon owns 50.01% of CENG and EDF owns the remaining 49.99% interest.  EDF exercised its put option on January 19, 2020.  That exercise triggered a contractual "*Baseball Arbitration*" appraisal process to determine the price that Exelon must pay to EDF for that interest.

3.     The Baseball Arbitration consists of several steps, including Party negotiations, the Parties engaging independent investment banks to value EDF's interest and, if those valuations differ by more than 5%, culminating in a third party investment bank deciding which of the Parties' respective investment bank valuations is closer to "*fair market value*."  As of the date of this filing, both Parties have engaged their respective investment banking firms. Those banks are expected to exchange their respective valuations on July 29, 2020.

4.     The Baseball Arbitration thus far has made clear that the Parties fundamentally disagree on the goal of the process.  In Exelon's view, the Parties' goal is to determine the price at which a willing buyer and a willing seller would transact for EDF's interest.  In other

---

[1]  **Exhibit C-001**, Put Agreement between Exelon, EDF, and CENG, April 1, 2014 (hereinafter "**Put Agreement**").  This Put Agreement was amended on January 29, 2018, and April 9, 2020.  *See* **Exhibit C-002**, First Amendment to Put Agreement, January 29, 2018; **Exhibit C-019**, Amendment of Put Agreement between EDF, Exelon, and CENG, April 9, 2020.

words, Exelon seeks to determine and pay the fair market value of EDF's interest.  Nothing more, nothing less.

5.   EDF, however, has repeatedly sought to re-write the Parties' agreement to gain a windfall of, potentially, several hundreds of millions of dollars.  It has staunchly avoided any suggestion that it is entitled only to the fair market value of its interest—despite the fact that this is precisely what the Parties' agreement calls for[2] and is commercially reasonable.

6.   In particular, EDF seeks to transform information that the Parties agreed to "*take into account*" when determining "*Fair Market Value*" into information that the Parties (and their respective appointed investment banks involved in the Baseball Arbitration process) **are required to adopt, without adjustment, in determining fair market value**.  This is not what the Put Agreement requires.  But taking such an approach would result in the windfall that EDF seeks.

7.   Likely aware that a fair and complete airing of the Parties' competing contractual interpretations would reveal the weaknesses of EDF's arguments, EDF again sought to re-write the Parties' agreement—this time to gain an unfair procedural advantage.  In April 2020, EDF improperly invoked the ICC Pre-Arbitral Referee Rules in a misguided attempt to seek non-provisional, merits-based orders requiring Exelon to apply EDF's incorrect interpretations of the Put Agreement.  In short, EDF sought to have the dispute that Exelon now (properly) puts before this Tribunal heard on an expedited timetable where Exelon was forced to reply on an abridged procedural schedule.  Unsurprisingly, on June 12, 2020,

---

[2]   *See* **Exhibit C-001**, Put Agreement, Section 7.1, Definition of "*Fair Market Value*" ("**'*Fair Market Value*'** *means the price at which the Designated Interest (without any discount for Seller's minority interest in CENG) would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts,* **as agreed by the parties or determined through Baseball Arbitration**.  *In determining Fair Market Value, the parties or investment banking firm(s) shall (x) take into account:* [enumerated factors]." (emphases added)).

the Pre-Arbitral Referee dismissed all of EDF's requests and ordered EDF to bear the costs of the Pre-Arbitral Referee Procedure.[3]

8.  Exelon has no choice but to initiate this arbitration before the proper forum to seek declaratory relief and to finally resolve the Parties' disputes over the interpretation of the Put Agreement.  In addition, despite the fact that it is now clear that the Parties' disputes address issues that are critical to the ongoing Baseball Arbitration, EDF has refused multiple requests from Exelon to stay the Baseball Arbitration until these critical issues of interpretation are determined.  As the Pre-Arbitral Referee observed in her order, "[i]*t is difficult to reconcile EDF's assertion that it will suffer 'immediate damage or irreparable loss' if Exelon is allowed to proceed with the Baseball Arbitration based on its own reading of the Put Agreement, with EDF's objection to Exelon's request to stay the Baseball Arbitration*."[4]  On this basis, Exelon also seeks from this Tribunal, once constituted, an interim order staying the ongoing Baseball Arbitration until this arbitration is completed. Exelon requests that, given the urgent nature of the relief sought and the upcoming milestones in the Baseball Arbitration process,[5] the Tribunal consider and decide this request for urgent conservatory measures on an expedited basis and no later than 30 days after the case file is transmitted to the Tribunal.  In the absence of that relief, any Award rendered by the Tribunal will be ineffectual.

9.  This Request for Arbitration proceeds in the following parts: in **Part I**, Exelon identifies the Parties and details the background of this dispute, including the exercise of EDF's put option, the Parties' negotiations to date, and EDF's unsuccessful attempt to invoke the Pre-Arbitral Referee Procedure; in **Part II**, Exelon describes the key issues in dispute; in **Part III**, Exelon requests a stay of the ongoing Baseball Arbitration process; in **Part IV**, Exelon sets out the Parties' agreement to arbitrate this dispute, nominates its arbitrator, and

---

[3]  *See* **Exhibit C-024**, *EDF Inc. v. Exelon Generation Company, LLC*, ICC Case No. PR 017/MK, Order, June 12, 2020 ("**Pre-Arbitral Referee Order**").  Exelon seeks its legal fees and expenses for participating in the improper Pre-Arbitral Referee procedure.  *See infra* ¶ 37(c).

[4]  **Exhibit C-024**, Pre-Arbitral Referee Order, ¶ 95.

[5]  *See infra* ¶ 33.

proposes a procedure for the appointment of the president of the Tribunal; and in **Part V**, Exelon specifies its Request for Relief.

## I.    BACKGROUND TO THE DISPUTE

### I.A.    The Parties

10.    The Claimant Exelon Generation Company, LLC is a limited liability company organized under the laws of Pennsylvania, with its principal place of business located at 300 Exelon Way, Kennett Square, Pennsylvania, 19348.    Exelon's parent company, Exelon Corporation, is a Fortune 100 company and the largest regulated utility in terms of customers and the largest operator of nuclear power plants in the United States.

11.    Exelon is represented in this dispute by Gibson, Dunn & Crutcher LLP, and all correspondence in this Arbitration may be addressed to the following:

> Mr. Rahim Moloo
> Mr. Mark Director
> Ms. Victoria R. Orlowski
> Ms. Charline Yim
> Gibson, Dunn & Crutcher LLP
> 200 Park Avenue
> New York, NY 10166-0193
>
> Tel:    +1 (212) 351-2413
> Fax:    +1 (212) 351-6213
> Email:  rmoloo@gibsondunn.com
>         mdirector@gibsondunn.com
>         vorlowski@gibsondunn.com
>         cyim@gibsondunn.com

12.    The Respondent EDF Inc. is a Delaware corporation with its principal place of business located at 5405 Wisconsin Avenue, Suite 400, Chevy Chase, Maryland, 20815.

13.    Exelon understands that EDF is represented in this dispute by Paul, Weiss, Rifkind, Wharton & Garrison LLP, and all correspondence in this Arbitration can be addressed to the following:

Martin Flumenbaum
Geoffrey R. Chepiga
Paul, Weiss, Rifkind,
Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064

Tel:    (212) 373-3421
Fax:    (212) 492-0421
E-mail: mflumenbaum@paulweiss.com
        gchepiga@paulweiss.com


Attn: Michael Hill
EDF, S.A.
30 avenue de Wagram
Paris 75008
France

Tel:    +33 1 40 42 85 01
Fax:    +33 1 40 42 85 03
E-mail:  michael.hill@edf-inc.com

**I.B.    CENG**

14.    CENG is the Parties' joint venture vehicle.  It owns and operates three nuclear power plants in Maryland and New York.  EDF acquired a 49.99% interest in CENG in December 2008. Exelon has owned the remaining 50.01% of CENG since March 2012, when Exelon's parent company, Exelon Corporation, merged with Constellation Energy (which, at the time, owned the 50.01% interest in CENG).

15.    Including Exelon, there are currently ten strategic merchant owners of nuclear power plants in the United States.  At least two of those owners—EDF and Entergy—are in the process of divesting their interests.   More generally, declining power prices and structural disincentives in organized power markets continue to challenge the economics of merchant

nuclear power plants.  A number of those plants have retired in recent years or are soon expected to be retired because they are no longer financially viable.[6]

16.     It is against this backdrop that EDF exercised its put option.

### I.C.     EDF's Exercise Of Its Put Option And The Put Agreement's Procedure For Determining Fair Market Value

17.     In the Put Agreement signed on April 1, 2014, Exelon and EDF agreed to a put option pursuant to which EDF could require Exelon to purchase its interest in CENG at a price to be agreed upon between the Parties or determined through a Baseball Arbitration process.[7]

18.     On November 20, 2019, EDF sent Exelon a letter providing notice of its decision to exercise the put option.[8]  Pursuant to the Put Agreement, EDF's put option was deemed to be exercised sixty days later, on January 19, 2020.[9]

19.     The exercise of the put option, among other things, initiated a procedure under the Put Agreement to determine the "*Fair Market Value*" of EDF's interest in CENG (the "**Designated Interest**") and, therefore, the price Exelon would pay EDF for the Designated Interest.  The Put Agreement defines Fair Market Value as the value resulting from the Baseball Arbitration process (including as may be agreed by the Parties), by reference to an arms-length transaction:

> "*Fair Market Value*" ***means the price at which the Designated Interest (without any discount for Seller's minority interest in CENG) would change hands between a willing buyer and a willing seller, neither being under***

---

[6]   *See, e.g.*, **Exhibit C-004**, Jared Anderson & William Freebairn, *Roughly 1.7 GW of US nuclear power capacity set to retire in 2020*, S&P GLOBAL PLATTS, December 20, 2019, https://www.spglobal.com/platts/en/market-insights/latest-news/electric-power/122019-feature-roughly-17-gw-of-us-nuclear-power-capacity-set-to-retire-in-2020.

[7]   *See* **Exhibit C-001**, Put Agreement.

[8]   *See* **Exhibit C-003**, Letter from EDF to Exelon, November 20, 2019.

[9]   *See* **Exhibit C-001**, Put Agreement, Section 2.1 ("*Seller may exercise the Put Option by giving 60 days advance written notice thereof to Purchaser (the 'Exercise Notice') stating that it is exercising the Put Option.*").  *See also* **Exhibit C-003**, Letter from EDF to Exelon, November 20, 2019 ("*This letter shall constitute the Exercise Notice as contemplated by Section 2.1 of the Put Agreement, and the Exercise Date of this Exercise Notice shall be January 19, 2020.*").

> *any compulsion to buy or to sell and both having reasonable knowledge*
> *of relevant facts, as agreed by the parties or determined through Baseball*
> *Arbitration.  In determining Fair Market Value, the parties or investment*
> *banking firm(s) shall (x) take into account: . . .*[10]

20.     The definition then includes seven factors that serve to assist the Parties' determination of

Fair Market Value.  The seven enumerated factors, which the Put Agreement says "*shall*

[be] *take*[n] *into account*" are: (1) CENG's financial statements; (2) CENG's annual

operating plan; (3) CENG's financial plan; (4) post-shut down decommissioning cost

obligation and decommissioning trust fund value determined taking into account all

applicable law; (5) obligations of CENG and its subsidiaries under the Employee Matters

Agreement; (6) prices as calculated based on various specified market consultant forecasts;

and (7) "[s]*uch other factors as may be relevant to a calculation of Fair Market Value.*"[11]

21.     The Put Agreement does not tell the Parties (or the investment banking firms involved in

the Baseball Arbitration) how they should "*take into account*" or weigh the seven factors.

Nor is any one factor afforded any more weight than the six other factors that should be

taken into account when assessing the Fair Market Value, including "[s]*uch other factors*

*as may be relevant to a calculation of Fair Market Value.*"[12]  In other words, the Parties'

agreement is not formulaic—otherwise a Baseball Arbitration process to determine the Fair

Market Value would be unnecessary.  Ultimately, the Fair Market Value is whatever price

the Parties agree to or that results from the remainder of the Baseball Arbitration.  And that

price is meant to reflect a price at which EDF's interest "*would change hands between a*

*willing buyer and a willing seller, neither being under any compulsion to buy or sell and*

*both having reasonable knowledge of relevant facts*."[13]

---

[10]   **Exhibit C-001**, Put Agreement, Section 7.1, Definition of "*Fair Market Value*" (emphases added).

[11]   **Exhibit C-001**, Put Agreement, Section 7.1, Definition of "*Fair Market Value*," ¶¶ 1-7.

[12]   **Exhibit C-001**, Put Agreement, Section 7.1, Definition of "*Fair Market Value*," ¶ 7.

[13]   **Exhibit C-001**, Put Agreement, Section 7.1, Definition of "*Fair Market Value*."

22.     The Put Agreement sets out the following procedure for the Baseball Arbitration:

> "*Baseball Arbitration*" *means the following procedure for determination of Fair Market Value.  Purchaser and Seller shall first attempt to agree on Fair Market Value in good faith.  If Purchaser and Seller cannot agree on Fair Market Value within sixty (60) days, then Purchaser and Seller shall each select an independent investment banking firm of national reputation and with experience in valuing assets of the type in question, and such investment banking firms shall each determine the fair market value of the Designated Interest within sixty (60) days after selection, with the average of the two valuations constituting Fair Market Value.  If the two valuations in the previous sentence differ by five percent (5%) or more, then the average of the two valuations shall not be binding, and the respective CEOs shall use their reasonable efforts to agree on Fair Market Value within thirty (30) days after receiving the valuations.  If the respective CEOs cannot reach agreement within such thirty (30) day period, then the two investment banking firms shall mutually agree on a third independent investment banking firm of national reputation within thirty (30) days after the end of such period, and such third independent investment banking firm shall then determine, within sixty (60) days after selection, which of the two valuations of the original investment banking firms is closer to fair market value, and such valuation shall constitute Fair Market Value.  Any such determination shall be binding on the parties.  In connection with any determination of Fair Market Value, each party shall bear the cost of the investment banking firm that it selects, and the cost of any valuation prepared by the third investment banking film shall be borne by the party whose investment banking firm's valuation was not selected.*[14]

23.     This definition confirms that "*Fair Market Value*" is the outcome of the Baseball Arbitration process.  If the Parties cannot agree to the "*Fair Market Value*," then the Parties will each appoint independent investment banking firms to assess "*fair market value*" (lower case).  Those valuations are then used in the Baseball Arbitration process.  If they are within 5% of one another, then the average of those values becomes the "*Fair Market Value*."  If not, the Parties' CEOs will attempt to negotiate a "*Fair Market Value*."  If that process fails, then a third investment banking firm will "*determine . . . which of the two*

---

[14]   **Exhibit C-001**, Put Agreement, Section 7.1, Definition of "*Baseball Arbitration*."

*valuations of the original investment banking firms is closer to fair market value, and such valuation shall constitute Fair Market Value.*"[15]

### I.D. The Parties' Negotiations To Date

24.     Shortly after EDF's exercise of the Put Option, and as contemplated by the Put Agreement,[16] the Parties began their discussions to attempt to agree on a Fair Market Value, exchanging several letters and phone calls.[17]

25.     Through this correspondence, it became increasingly clear that EDF was not faithfully interpreting the Put Agreement's terms. **First**, EDF appeared to be re-writing the Put Agreement to transform the factors that the Parties "*shall take into account*" into binding factors which must be adopted, without adjustment, in the determination of Fair Market Value.[18] EDF further rejected Exelon's position that the definition of Fair Market Value refers to an arms-length transaction.[19]

---

[15]   **Exhibit C-001**, Put Agreement, Section 7.1, Definition of "*Baseball Arbitration*" (emphases added).

[16]   **Exhibit C-001**, Put Agreement, Section 5.1 ("*The Parties shall work in good faith to determine Fair Market Value as promptly as practicable following the Exercise Date . . .*").

[17]   *See, e.g.*, **Exhibit C-005**, Email from EDF to Exelon, *attaching* Market Consultant Scoping Document, January 23, 2020; **Exhibit C-006**, Email from Exelon to EDF, *attaching* Letter from Exelon to EDF and Market Consultant Scoping Document, January 28, 2020; **Exhibit C-007**, Email from EDF to Exelon, *attaching* Letter from EDF to Exelon, January 30, 2020; **Exhibit C-008**, Email from EDF to Exelon, Market Consultant Scoping Document, and Redline of Market Consultant Scoping Document, February 7, 2020; **Exhibit C-009**, Email from Exelon to EDF, *attaching* Letter from EDF to Exelon and Market Consultant Scoping Document, February 14, 2020.

[18]   *See* **Exhibit C-010**, Email from EDF to Exelon, *attaching* Letter from EDF to Exelon, Market Consultant Scoping Document, and Redline of Market Consultant Scoping Document, February 20, 2020, p. 4 ("*As you know, EDF and ExGen agreed in the Put Agreement to work in good faith to determine the Fair Market Value of EDF's interest in CENG based on, among other things, pricing information.*"); **Exhibit C-012**, Email from EDF to Exelon, *attaching* Letter from EDF to Exelon, February 28, 2020, p. 6 (alleging that "[t]*he Put Agreement is clear on what it is that the six market consultants must provide to EDF and ExGen, and on what the calculation of Fair Market Value shall be based*" and "*Fair Market Value would be determined based on a composite average of six independent consultant forecasts*"); **Exhibit C-024**, Pre-Arbitral Referee Order, ¶ 46. *See also* **Exhibit C-011**, Email from Exelon to EDF, *attaching* Letter from Exelon to EDF, February 26, 2020.

[19]   *See* **Exhibit C-012**, Email from EDF to Exelon, *attaching* Letter from EDF to Exelon, February 28, 2020, p. 6, n. 4 ("*Further, the Put Agreement contains no 'objective' to arrive at an 'arms-length price.' The Put Agreement requires a sale at the extensively defined-term 'Fair Market Value,' the definition of which was the product of an extensive negotiation between the parties. The Put Agreement nowhere contains the words 'arms-length.'*").

26. **Second**, the Parties could not agree on the "*customary terms of reference*"[20] for the Market Consultants who, pursuant to the sixth factor, would be engaged by CENG to provide market consultant forecasts.[21]  When it became clear that the Parties could not agree on customary terms of reference, Exelon referred to the Put Agreement's procedure for resolving such an impasse.[22]  Specifically, the Put Agreement required the Parties to "*negotiate in good faith*" for ten days to agree on a way forward.[23]  Yet, EDF refused to negotiate in good faith.  Instead, it unilaterally engaged the Market Consultants before the ten-day negotiation period expired.[24]  Exelon notified EDF in contemporaneous correspondence of EDF's breach of contract,[25] and, to avoid further prejudice, of the fact that it had no choice but to engage the Market Consultants separately as well.[26]

---

[20] **Exhibit C-001**, Put Agreement, Section 7.1, Definition of "*Fair Market Value*," ¶ 6(b) ("*For the purposes of this paragraph (6), the consultants will be engaged and paid for by CENG on customary terms of reference jointly agreed between the Purchaser and the Seller (consent not to be unreasonably withheld), with the calculation of Fair Market Value reflecting the cash outflow associated with Seller's pro rata portion of such consultant expense.*").

[21] *See* **Exhibit C-009**, Email from Exelon to EDF, *attaching* Letter from Exelon to EDF and Market Consultant Scoping Document, February 14, 2020; **Exhibit C-010**, Email from EDF to Exelon, *attaching* Letter from EDF to Exelon, Market Consultant Scoping Document, and Redline of Market Consultant Scoping Document, February 20, 2020; **Exhibit C-011**, Email from Exelon to EDF, *attaching* Letter from Exelon to EDF, February 26, 2020.

[22] *See* **Exhibit C-011**, Email from Exelon to EDF, *attaching* Letter from Exelon to EDF, February 26, 2020, p. 6 (observing that "[t]*he parties' failure to agree to the terms of reference constitutes a 'Failed Element' under the Put Agreement*" and referring to paragraph 6(g) of the "*Fair Market Value*" definition).

[23] **Exhibit C-001**, Put Agreement, Section 7.1, Definition of "*Fair Market Value*," ¶ 6(g).

[24] *See* **Exhibit C-012**, Email from EDF to Exelon, *attaching* Letter from EDF to Exelon, February 28, 2020, p. 7 ("*EDF has no choice but to commence engagement of the six market consultants by Tuesday, March 3*"); **Exhibit C-013**, Email from Exelon to EDF, *attaching* Letter from Exelon to EDF, March 2, 2020, pp. 7-8; **Exhibit C-014**, Email from Exelon to EDF, March 5, 2020; **Exhibit C-015**, Email from EDF to Exelon, *attaching* Letter from EDF to Exelon, March 6, 2020, pp. 6-7; **Exhibit C-016**, Email from Exelon to EDF, *attaching* Letter from Exelon to EDF, March 12, 2020, p. 6; **Exhibit C-017**, Email from EDF to Exelon, *attaching* Letter from EDF to Exelon, March 17, 2020, p. 6 (confirming that "*EDF in fact reached out to all six market consultants on March 3*").

[25] *See* **Exhibit C-013**, Email from Exelon to EDF, *attaching* Letter from Exelon to EDF, March 2, 2020, p. 7.

[26] *See* **Exhibit C-014**, Email from Exelon to EDF, March 5, 2020 ("*Following up on our conversation, I understand that EDF has begun to reach out to the Market Consultants to engage them separately. As noted in my letter from Monday, we reserve all of our rights, but in the circumstances we will also seek to separately engage the Market Consultants.*").

27.    On April 9, 2020, the Parties agreed to an extension of time in the Baseball Arbitration, during which the Parties would obtain information from the Market Consultants pursuant to their respective terms of reference.[27]

### I.E.    EDF's Unsuccessful Attempt To Use The Pre-Arbitral Referee Procedure To Resolve The Dispute Between The Parties

28.    To Exelon's surprise, on April 24, 2020, Exelon received EDF's Request for Pre-Arbitral Referee Hearing and Expedited Relief ("**Pre-Arbitral Referee Request**"),[28] initiating a Pre-Arbitral Referee Procedure under the ICC's Pre-Arbitral Referee Rules seeking relief that, under the Parties' arbitration agreement, can only be obtained in an ICC arbitration.[29]

29.    In EDF's Pre-Arbitral Referee Request, it sought the following orders:

> *(a) an order declaring that any calculation of Fair Market Value must take into account the composite average of forecasts generated by the six market consultants using assumptions that are developed independently and provided by the market consultants themselves;*
>
> *(b) an order invalidating any submission in the Baseball Arbitration that does not give effect to the market consultant's forecasts required by the Put Agreement;*
>
> *(c) an order declaring that EDF and ExGen have not triggered a "Failed Element" under the Put Agreement, and ExGen cannot use a substitute element;*
>
> *(d) payment of the costs resulting from ExGen's breaches of the Put Agreement, including the costs of this proceeding and those incurred by EDF in retaining the six market consultants; and*

---

[27]    *See* **Exhibit C-019**, Amendment of Put Agreement between EDF, Exelon, and CENG, April 9, 2020.   *See also* **Exhibit C-016**, Email from Exelon to EDF, *attaching* Letter from Exelon to EDF, March 12, 2020 (further explaining that due to EDF's unilateral engagement of the Market Consultants, when Exelon was required to engage those same Market Consultants separately, they expressed hesitation at accepting the engagement with Exelon because they already had been engaged by EDF); **Exhibit C-017**, Email from EDF to Exelon, *attaching* Letter from EDF to Exelon, March 17, 2020; **Exhibit C-018**, Email from EDF to Exelon, *attaching* Letter from EDF to Exelon and draft Put Agreement Amendment, March 23, 2020.

[28]    *See* **Exhibit C-024**, Pre-Arbitral Referee Order, ¶ 17.

[29]    *See* **Exhibit C-001**, Put Agreement, Section 7.10(a).

*(e) any such other and further relief as the Referee deems just and proper.*[30]

30.     EDF's Pre-Arbitral Referee Request suffered from an obvious defect.  In order for the Pre-Arbitral Referee to grant EDF's requests, she would be obliged to resolve the merits of a substantive dispute between the Parties regarding the meaning of "*Fair Market Value*" and how Fair Market Value is to be determined in the Baseball Arbitration.[31]  This is **expressly** prohibited by the Pre-Arbitral Referee Rules—because, among other things, it would not be possible to properly and fairly decide the dispute within the timeframe allotted[32]—and was fatal to EDF's requests.[33]  And even if the Pre-Arbitral Referee could grant such relief, as Exelon explained, EDF was wrong on the merits.[34]  Ultimately, the Parties' arbitration agreement made clear that the proper forum for the resolution of the disputes identified by EDF is this Tribunal—a three-member tribunal constituted in accordance with the ICC Arbitration Rules.[35]

31.     The Pre-Arbitral Referee accordingly dismissed all of EDF's requests,[36] observing that EDF both failed to meet the standards set out in Article 2.1 of the Pre-Arbitral Referee Rules,[37] and that the relief EDF requested "*would require the Referee to prejudge the merits of the case and presume that EDF prevails on the merits*."[38]  In reaching this conclusion,

---

[30]     **Exhibit C-024**, Pre-Arbitral Referee Order, ¶ 46.

[31]     *See* **Exhibit C-024**, Pre-Arbitral Referee Order, ¶ 47.

[32]     *See* **Exhibit C-024**, Pre-Arbitral Referee Order, ¶ 96 (observing that "*Exelon raised a host of legitimate issues relating to the interpretation of the relevant provisions of the Put Agreement*," which would not be possible to determine without a proper investigation).  This procedure is meant to result in a decision within 30 days after the Referee is appointed and receives the files from the ICC.  EDF spent weeks putting together its Pre-Arbitral Referee Request, while using an improper procedure that afforded Exelon only ten days to answer the merits of the Parties' dispute.

[33]     *See* **Exhibit C-024**, Pre-Arbitral Referee Order, ¶ 71 and n. 107 (citing Article 6.3 of the Pre-Arbitral Referee Rules).

[34]     *See* **Exhibit C-024**, Pre-Arbitral Referee Order, ¶¶ 48, 50.

[35]     *See* **Exhibit C-024**, Pre-Arbitral Referee Order, ¶ 47.

[36]     *See* **Exhibit C-024**, Pre-Arbitral Referee Order, ¶ 102.

[37]     *See* **Exhibit C-024**, Pre-Arbitral Referee Order, ¶¶ 90-95, 98-99.

[38]     **Exhibit C-024**, Pre-Arbitral Referee Order, ¶¶ 96-97.  *See also* **Exhibit C-024**, Pre-Arbitral Referee Order, ¶ 100.

the Referee also noted that "*Exelon raised a host of legitimate issues relating to the interpretation of the relevant provisions of the Put Agreement*."[39]  The Referee ordered that EDF pay the costs of the improper Pre-Arbitral Referee Procedure.[40]

### I.F.    The Status Of The Baseball Arbitration

32.    In accordance with the Put Agreement, as amended by the Parties on April 9, 2020, the Parties have appointed their respective independent investment banking firms ("**Party Appointed Banks**").  Exelon selected Barclays Capital Inc. and The NorthBridge Group, to act as Exelon's Party Appointed Bank[41] and EDF selected Moelis & Company, PJ Solomon, LP, and CE Capital Advisors, Inc. to act as EDF's Party Appointed Bank.[42]

33.    At the time of the filing of this Request for Arbitration, and subject to any stay that may be granted, the remaining milestones in the Baseball Arbitration are the following:

(a)    By July 29, 2020, the Party Appointed Banks shall, respectively, determine the fair market value of the Designated Interest.  If the two valuations differ by less than 5%, the average of the two valuations shall constitute Fair Market Value.

(b)    In the event the two valuations differ by 5% or more, by August 28, 2020, the respective CEOs shall use their reasonable efforts to agree on Fair Market Value.

(c)    If the CEOs cannot reach an agreement, by September 27, 2020, the Party Appointed Banks shall mutually agree on a third independent investment banking firm (the "**Third Bank**" and, collectively with the Party Appointed Banks, the "**Banks**").

---

[39]    **Exhibit C-024**, Pre-Arbitral Referee Order, ¶ 96.

[40]    *See* **Exhibit C-024**, Pre-Arbitral Referee Order, ¶¶ 114, 119.

[41]    *See* **Exhibit C-023**, Letter from Exelon to EDF, May 30, 2020

[42]    *See* **Exhibit C-022**, Letter from EDF to Exelon, May 29, 2020.

(d)     By November 26, 2020, the Third Bank will determine which of the two valuations from the Party Appointed Banks is the closest to fair market value, and such valuation shall constitute Fair Market Value.

34.     Despite the fact that it is now clear that the Parties' disputes address issues that are critical to the ongoing Baseball Arbitration, EDF has refused multiple requests from Exelon to stay the Baseball Arbitration.[43]  This is all the more surprising given EDF, as recognized by the Pre-Arbitral Referee, has argued that it would suffer "*immediate damage or irreparable loss*" if the Baseball Arbitration were to proceed without clarity on the contract's interpretation.[44]

35.     Most recently, in preparation for the potential engagement of a Third Bank, Exelon proposed instructions for the Third Bank that merely: (*i*) quoted directly the language from the Put Agreement detailing the Third Bank's mandate; and (*ii*) made clear the Third Bank should not be asked to decide any of the legal disputes between the Parties.[45]  While this proposal was based on a suggestion made by EDF,[46] EDF has since changed its position.[47]  In short, EDF has proven that it is unwilling to accept even the most straightforward provisions of the Put Agreement.

---

[43]  *See* **Exhibit C-020**, Email from Exelon to EDF, *attaching* Letter from Exelon to EDF, May 8, 2020; **Exhibit C-021**, Email from EDF to Exelon, *attaching* Letter from EDF to Exelon, May 12, 2020; **Exhibit C-025**, Email from Exelon to EDF, *attaching* Letter from Exelon to EDF, June 19, 2020; **Exhibit C-026**, Email from EDF to Exelon, *attaching* Letter from EDF to Exelon, June 26, 2020.

[44]  **Exhibit C-024**, Pre-Arbitral Referee Order, ¶ 95.

[45]  *See* **Exhibit C-027**, Email from Exelon to EDF, *attaching* Letter from Exelon to EDF, June 30, 2020, pp. 4-5; *See also* **Exhibit C-029**, Email from Exelon to EDF, *attaching* Letter from Exelon to EDF, July 6, 2020.

[46]  *See* **Exhibit C-026**, Email from EDF to Exelon, *attaching* Letter from EDF to Exelon, June 26, 2020, n. 2.

[47]  *See* **Exhibit C-028**, Email from EDF to Exelon, *attaching* Letter from EDF to Exelon, July 3, 2020.

## II.   THE DISPUTE BEFORE THE ARBITRAL TRIBUNAL

36.   Exelon respectfully requests that the Arbitral Tribunal resolve the Parties' disputes with respect to the interpretation of the Put Agreement.   Exelon requests that the Arbitral Tribunal declare the following:

(a)   In determining the "*fair market value*" of the Designated Interest, the Banks are not required to "*take into account*" the factors included in the definition of "*Fair Market Value*."

(b)   If the Tribunal finds that the Banks are required to "*take into account*" these factors, that:

    i.   "[T]*ake into account*" means the Banks must consider these factors, but have discretion over the weight they give those factors, if any, in their respective assessments of fair market value.

    ii.   Pursuant to sub-paragraph (7) of the Fair Market Value definition, the Banks can take into account any "*other factors as may be relevant to a calculation of Fair Market Value*," including other factors that would cause them to adjust or disregard any or all of the factors identified in sub-paragraphs (1) to (6).

(c)   EDF shall pay Exelon's legal fees and expenses it incurred as a result of the improper Pre-Arbitral Referee Procedure, amounting to US$ 528,775.25, plus appropriate interest.[48]

37.   Exelon is entitled to this relief for the following reasons:

(a)   The Put Agreement does not require the Banks to take into account the seven factors in their respective valuations.   Specifically, the Put Agreement requires the Banks

---

[48]   The Pre-Arbitral Referee determined she did not have the authority under the Pre-Arbitral Referee Rules to issue an order awarding legal fees and expenses.   *See* **Exhibit C-024**, Pre-Arbitral Referee Order, ¶¶ 115-16.

to determine "*fair market value*" (lower case) as opposed to "*Fair Market Value*" (as defined).[49]   In other words, once the Baseball Arbitration proceeds past the Party-negotiation phase without an agreement on Fair Market Value, the Banks are mandated to reach their own assessments of lower-case "*fair market value*," without reference to the definition in the Put Agreement.

(b)   Even if the Banks are obliged to refer to the definition of Fair Market Value:

    i.   Fair Market Value means what the definition says: the value determined in an arms-length transaction, as either agreed by the Parties or determined through the remainder of the Baseball Arbitration process.[50]   As made clear by the ordinary meaning of "*take into account*," the Banks have discretion as to what weight, if any, to give to the factors in sub-paragraphs (1) to (7) of the "*Fair Market Value*" definition.   The act of taking information "*into account*" involves the **consideration** of that information.   It does not mandate how that information should be evaluated and whether such information must form the basis of each Bank's valuation.

    ii.   Pursuant to sub-paragraph (7) of the Fair Market Value definition, the Banks can take into account any "*other factors as may be relevant to a calculation of Fair Market Value*," including other factors that would cause them to adjust or disregard any or all of the factors identified in sub-paragraphs (1) to (6).   This seventh factor confirms that the definition of Fair Market Value is not formulaic, and the objective of the definition of Fair Market Value is to reach a price that reflects an arms-length transaction. In short, this factor makes plain that even if the Banks are obliged to refer

---

[49]   **Exhibit C-001**, Put Agreement, Definition of "*Baseball Arbitration*" ("*If Purchaser and Seller cannot agree on Fair Market Value within sixty (60) days, then Purchaser and Seller shall each select an independent investment banking firm of national reputation and with experience in valuing assets of the type in question, and such investment banking firms shall each determine the fair market value of the Designated Interest within sixty (60) days after selection, with the average of the two valuations constituting Fair Market Value. . . .*" (emphases added)).

[50]   *See* **Exhibit C-001**, Put Agreement, Section 7.1, Definition of "*Fair Market Value*."

to the definition of Fair Market Value in their valuation exercise, they have complete discretion to consider any "o*ther factors as may be relevant to a calculation of Fair Market Value*," without any caveats or constraints.

(c)     Exelon is entitled to the legal fees and expenses it incurred as a result of EDF's improper initiation of the Pre-Arbitral Referee Procedure because EDF's initiation of the Pre-Arbitral Referee Procedure was a breach of the Parties' arbitration agreement.

## III.    EXELON REQUESTS AN IMMEDIATE STAY OF THE BASEBALL ARBITRATION

38.     As explained in **Part I** above, the Baseball Arbitration is ongoing, and the Parties are engaging in this Baseball Arbitration pursuant to fundamentally inconsistent interpretations of the Put Agreement.  Proceeding without a stay means that the Party Appointed Banks are assessing fair market value on the basis of different instructions.  It also means, as highlighted by the most recent disagreement between the Parties, that if a Third Bank is required to act, it will likely face conflicting instructions from the Parties.  Resolution of the dispute between the Parties regarding the interpretation of the provisions of the Put Agreement is clearly necessary before the Baseball Arbitration continues.

39.     In response to EDF's initiation of the Pre-Arbitral Referee Procedure, Exelon applied to the Pre-Arbitral Referee for a stay of the Baseball Arbitration.  In her Order, the Pre-Arbitral Referee appeared to accept that all of the criteria for granting relief under the Pre-Arbitral Referee Rules were met,[51] having noted that "[i]*t is difficult to reconcile EDF's assertion that it will suffer '*immediate damage or irreparable loss*' if Exelon is allowed to proceed with the Baseball Arbitration based on its own reading of the Put Agreement, with EDF's objection to Exelon's request to stay the Baseball Arbitration*."[52]  Nonetheless, the Pre-Arbitral Referee denied the stay on the basis of an incorrect assessment of the *status*

---

[51]   *See* **Exhibit C-024**, Pre-Arbitral Referee Order, ¶¶ 105-107.

[52]   **Exhibit C-024**, Pre-Arbitral Referee Order, ¶ 95.

*quo*.[53]  This Arbitral Tribunal's authority to grant such relief is much broader than the Referee's, and, in any event, the Tribunal is not bound by the Pre-Arbitral Referee's decision.

40.    While key milestones in this Baseball Arbitration are fast approaching, EDF has inexplicably refused to agree to a stay.  This, despite EDF's argument to the Pre-Arbitral Referee that it would suffer "*immediate damage or irreparable loss*" if the Baseball Arbitration were to continue without a determination of the Parties' contractual interpretation dispute.

41.    Given the upcoming milestones in the Baseball Arbitration process, Exelon respectfully requests that the Tribunal consider and decide this request on an expedited basis and no later than 30 days after the case file is transmitted to the Tribunal.

### IV.    PROCEDURAL MATTERS

### IV.A.  The Arbitration Agreement

42.    Section 7.10(a) of the Put Agreement contains the Parties' agreement to arbitrate this dispute:

> With the sole and exclusive exceptions provided for in part (b) of this <u>Section 7.10</u>, in the event of any dispute arising out of or in connection with this Agreement, including any dispute regarding its existence, breach, termination or validity, each party shall have the right to have recourse to and shall be bound by the pre-arbitral referee procedure of the International Chamber of Commerce in accordance with its Rules for a Pre-Arbitral Referee Procedure.  **All disputes arising out of or in connection with this Agreement (including as to existence, breach, termination and validity) shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce (the "<u>Rules</u>") by three arbitrators appointed in accordance with said Rules.**  The place of the pre-arbitral referee procedure and of the arbitration procedure shall be New York, New York, United States of America.  The proceedings before the arbitral tribunal (including with respect to the Pre-Arbitral Referee Procedure) shall be governed by the Rules.  The rules of law to be applied by the arbitral

---

[53]  *See* **Exhibit C-024**, Pre-Arbitral Referee Order, ¶ 108.

*tribunal to the merits of the dispute shall be the rules of law of the State of New York. The language of the arbitration shall be English. Evidence shall be provided in English and pleadings shall be done in English. The arbitral tribunal shall render its decision within six months from the date of signature of the terms of reference. Any decision or award of the arbitral tribunal shall be final and binding upon the parties to the arbitration proceeding. Without limiting the authority conferred on the arbitral tribunal by this Agreement and the Rules, the arbitral tribunal shall have the authority to award specific performance. The parties waive to the extent permitted by applicable law any rights to appeal or to review of such award by any court or tribunal. The parties hereby submit to the exclusive jurisdiction of the federal and state courts of the State of New York sitting in the Borough of Manhattan, and agree not to raise any objection to venue in such court, with respect to the enforcement of this <u>Section 7.10(a)</u> and any application to confirm, vacate or modify the decision or award of the arbitration tribunal. The parties agree that, once confirmed, the arbitral award may be enforced against the parties to the arbitration proceeding or their assets wherever they may be found and that a judgment upon the arbitral award may be entered in any court having jurisdiction thereof.*[54]

43.     Pursuant to the above:

   (a)     The governing law of the dispute is the law of the State of New York.[55]

   (b)     The arbitral tribunal shall be comprised of three members appointed in accordance with the Rules.

   (c)     The place of the arbitration shall be New York, New York, USA.

   (d)     The language of the arbitration shall be English (including evidence and pleadings).

---

[54]   **Exhibit C-001**, Put Agreement, Section 7.10(a) (emphasis added).

[55]   *See also* **Exhibit C-001**, Put Agreement, Section 7.9 ("*This Agreement shall be governed by and construed in accordance with the laws of the State of New York.*").

### IV.B.   The Arbitral Tribunal

44.   In accordance with Article 12(4) of the Rules, Exelon nominates Mr. Paul Friedland, a national of the United States of America, as its arbitrator.[56]

45.   Exelon proposes the following procedure for the nomination and confirmation of the President following the confirmation of the co-arbitrators:

(a)   Within seven days of the confirmation of the co-arbitrators, the co-arbitrators shall jointly identify six president candidates based on discussions between each Party and its nominated co-arbitrator.   In preparing this list of candidates, the co-arbitrators and Parties should aim to identify at least two candidates who reflect ethnic or gender diversity.

(b)   Once this list has been transmitted to the Parties, they shall have five days to rank the six candidates selected by the co-arbitrators (one being the highest and most favored, and six being the lowest and least favored).   The Parties' ranking for each candidate will then be added to indicate each candidate's total score.

(c)   The candidate with the lowest score shall be nominated as President.   In the event of a tie in lowest score, the co-arbitrators shall select one of the tied candidates.   If they fail to agree, they will select one through a random selection process, aided as necessary by the ICC Court.

(d)   The ICC Secretariat shall confirm that the nominated candidate does not have any conflicts, is available, and is willing to accept the nomination.

(e)   If the nominated candidate is able to accept, she or he will be confirmed by the ICC Court or the Secretary-General.   If she or he is unavailable, the ICC Court will proceed to appoint the candidate with the next lowest score, subject to step (d).

---

[56]   *See* **Annex A**, White & Case, Biography of Mr. Paul Friedland, *available at* https://www.whitecase.com/people/paul-friedland.

46.    In selecting the President of the Tribunal, Exelon requests that the Parties, co-arbitrators, and the ICC Court shall take into account the following ideal characteristics: substantial experience acting as an arbitrator in disputes governed by the Rules; fluency in English; and experience in disputes relating to the nuclear energy sector.  Moreover, Exelon does not object to a U.S. national serving as President.

47.    Moreover, Exelon requests that the ICC Court and Secretariat expedite the constitution of the Arbitral Tribunal to the greatest extent possible so that the Arbitral Tribunal will be in place to hear and decide Exelon's request for a stay of the Baseball Arbitration as soon as possible to avoid irreparable harm to Exelon.

### IV.C.  Requisite Copies And Filing Fee

48.    In accordance with Article 4(4) of the Rules and the recent ICC Guidance Note,[57] Exelon has:

    (a)    Provided an electronic copy of this communication to the Secretariat and, as a courtesy, EDF's counsel; and

    (b)    Paid the US$ 5,000 filing fee to commence an arbitration.

## V.    REQUEST FOR RELIEF

49.    Exelon respectfully requests that the Arbitral Tribunal:

    (a)    **Declare**, in determining the "*fair market value*" of the Designated Interest, the Banks are not required to "*take into account*" the factors included in the definition of "*Fair Market Value*";

    (b)    If the Tribunal finds that the Banks are required to "*take into account*" these factors, **declare**:

---

[57] *See* ICC Guidance Note on Possible Measures Aimed at Mitigating the Effects of the COVID-19 Pandemic, April 9, 2020.

      i.    "[T]*ake into account*" means the Banks must consider these factors, but have discretion over the weight they give those factors, if any, in their respective assessments of fair market value; and

     ii.    Pursuant to sub-paragraph (7) of the Fair Market Value definition, the Banks can take into account any "*other factors as may be relevant to a calculation of Fair Market Value*," including other factors that would cause them to adjust or disregard any or all of the factors identified in sub-paragraphs (1) to (6);

(c)    **Order** EDF to pay Exelon's legal fees and expenses incurred as a result of the improper Pre-Arbitral Referee Procedure, amounting to US$ 528,775.25, plus appropriate interest; and

(d)    **Order** EDF to pay the costs of this Arbitration, including the fees and expenses of the Arbitral Tribunal, the ICC's administrative charges, and Exelon's legal fees, expenses and experts' fees.

Dated: July 8, 2020

For and on behalf of Exelon Generation Company, LLC

GIBSON, DUNN & CRUTCHER LLP